UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

FILED
~~...~~
08 JUN 24 PM 1:05
SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

| | |
|---|---|
| EDWARD ZEMPRELLI, Derivatively on Behalf of ELI LILLY AND COMPANY,<br><br>    Plaintiff,<br><br>    vs.<br><br>SIDNEY TAUREL, JOHN C. LECHLEITER, SIMON N.R. HARFORD, ALAN BREIER, KAREN N. HORN, ALFRED G. GILMAN, FRANKLYN G. PRENDERGAST, MARTIN S. FELDSTEIN, ELLEN R. MARRAM, KATHI P. SEIFERT, SIR WINFRIED BISCHOFF, J. ERIK FYRWALD, J. MICHAEL COOK, CHARLES E. GOLDEN, AUGUST M. WATANABE, GEORGE M.C. FISHER, ALVA O. WAY and JOHN ROSE,<br><br>    Defendants<br><br>    - and -<br><br>ELI LILLY AND COMPANY, an Indiana corporation,<br><br>    Nominal Defendant. | Case No.<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACHES OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934** |

**1: 08-cv- 08 54 -SEB -TAB**

<u>JURY TRIAL DEMANDED</u>

Plaintiff, by his attorneys, submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of Eli Lilly and Company ("Lilly" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 ("Exchange Act") that occurred between March 2002 and the present (the "Relevant Period") and that have caused substantial losses to Lilly and other damages, such as to its reputation and goodwill.

2.      Lilly produces and markets Zyprexa (olanzopine), a drug used to treat patients who have schizophrenia, among other things. Zyprexa, first introduced in 1996, is by far Lilly's largest-selling drug, with sales of $4.3 billion in 2006 alone. Prior to the beginning of the Relevant Period, there was a controversy in scientific journals and the media regarding whether and to what degree Zyprexa caused weight gain, high blood sugar and, most importantly, diabetes.

3.      At the beginning of the Relevant Period, Lilly, under defendants' direction, claimed that Zyprexa did not cause diabetes-related side effects. Once the publicly available clinical data rendered these claims untenable, defendants directed Lilly to disseminate public statements claiming instead that Zyprexa did not cause more side effects than similar medications made by its competitors. Eventually, mounting clinical data showed that Zyprexa not only does cause such side effects, but also to a greater extent than similar medications made by its competitors. Unsurprisingly, these revelations caused the sales growth of Zyprexa to plummet and spawned thousands of product liability lawsuits against Lilly which resulted in billions of dollars in settlements. To date, Lilly has paid approximately $1.2 billion to settle over 31,000 lawsuits filed by people claiming that Zyprexa harmed them.

4.      It has now come to light that defendants caused or allowed the Company to conceal internal survey results and other studies showing that Zyprexa is indeed linked to weight gain, high blood sugar and diabetes. Defendants caused the Company to engage in an illicit scheme to conceal the side effects of Zyprexa, misrepresenting the drug's known adverse side effects to the public. A series of

- 1 -

articles in the *New York Times* published excerpts from internal Lilly documents detailing the cover-up of problems associated with Zyprexa. For example, a December 17, 2006 *New York Times* article stated that: "[i]n four surveys conducted by Lilly's marketing department, the company found that 70 percent of psychiatrists polled had seen at least one of their patients develop high blood sugar or diabetes while taking Zyprexa, compared with about 20 percent for [Zyprexa's competitors] Risperdal or Seroquel." *Lilly never disclosed those findings*.

5.      This document and several others uncovered by the *New York Times* show for the first time that defendants knew about the adverse side effects and known risks of Zyprexa, and yet had caused or allowed the Company to mislead patients, doctors, and investors.

6.      Consequently, the Company now faces substantial liability in connection with its cover-up of problems associated with Zyprexa. In fact, the price of Lilly's stock declined nearly 6% in the five trading days during which the *New York Times'* series of articles were published. The reaction of the market was quickly validated, as less than a month later, defendants settled several hundred product liability suits for $500 million. The Company's litigation woes remain far from over, unfortunately, as there are numerous other lawsuits brought on behalf of patients that are still pending. Because of the now-public Lilly documents, these additional lawsuits will likely be very costly for the Company. Finally, because of defendants' illegal actions and course of conduct during the Relevant Period, the Company is also the subject of several class action lawsuits that allege violations of federal securities laws. As a result, Lilly has expended and will continue to expend significant sums of money.

7.      Defendants also marketed Zyprexa and encouraged doctors to prescribe it for uses that were not approved by the Food and Drug Administration ("FDA"). The defendants caused the Company to engage in a calculated marketing plan to defraud state Medicaid programs out of millions of dollars for unproven and potentially unsafe uses of Zyprexa. As a result, the Company has been sued by Mississippi's attorney general, in a suit that seeks to recover money paid to Lilly by Medicaid and charges Lilly with promoting Zyprexa for unapproved uses. Currently, there are at least seven other states that have followed Mississippi's lead, filing similar suits. More states appear to be preparing to do the same.

8.    Lilly's improper statements during the Relevant Period failed to disclose and misrepresented the following material adverse facts, which defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing, or should have known:

(a)    An unpublished Lilly report from November 1999 showing that in 70 clinical trials, 16% of patients taking Zyprexa for a year gained more than 66 pounds;

(b)    A non-public November 1999 e-mail message from defendant Alan Breier ("Breier"), Lilly's Vice President for Medical and Chief Medical Officer, to two-dozen Lilly employees stating that "Olanzapine-associated weight gain and possible hyperglycemia is a major threat to the long-term success of this critically important molecule";

(c)    In 1999, Lilly discovered but did not disclose that blood sugar levels increased in patients taking Zyprexa for three years, notwithstanding the fact that weight gain appeared to plateau after nine months;

(d)    In 2000, doctors that Lilly had retained to consider potential links between Zyprexa and diabetes warned the Company that "unless we come clean on this, it could get much more serious than we might anticipate";

(e)    In 2001, undisclosed Lilly marketing research found that psychiatrists were consistently reporting that significantly more of their patients were developing high blood sugar or diabetes while taking Zyprexa compared to other similar antipsychotic drugs;

(f)    In four undisclosed surveys conducted by Lilly's marketing department, the Company found that 70% of psychiatrists polled had seen at least one of their patients develop high blood sugar or diabetes while taking Zyprexa, compared with about 20% for Zyprexa's competitors Risperdal or Seroquel;

(g)    According to an undisclosed February 2000 memo sent to top Lilly scientists, patients on Zyprexa were 3.5 times as likely to experience high blood sugar levels as those taking a placebo;

(h)    Lilly's undisclosed review of data from its clinical trials found that the incidence of treatment-emergent hyperglycemia in the olanzapine group (3.6%) was higher than that in the placebo group (1.05%); and

- 3 -

(i)      The defendants caused or allowed the Company to engage in a calculated marketing plan to defraud state Medicaid programs out of millions of dollars for unproven and potentially unsafe uses of Zyprexa.

9.      Because of these improper statements, Lilly's stock traded at artificially inflated levels during the Relevant Period. While Lilly's value was inflated, the defendants directed the Company to repurchase over $1.1 billion of its own stock. Moreover, certain of the defendants sold $25 million worth of their personally held shares while in possession of material non-public information.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction in this case under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has jurisdiction over all causes of action asserted herein pursuant to 28 U.S.C. §1332(a)(2) in that plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.      This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) Lilly maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Lilly occurred in

this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

13.    Plaintiff Edward Zemprelli is, and was at times relevant hereto, an owner and holder of Lilly common stock. Plaintiff is a citizen of Pennsylvania.

14.    Nominal defendant Lilly is a corporation organized and existing under the laws of the state of Indiana with its headquarters located at Lilly Corporate Center, Indianapolis, Indiana 46285. Lilly researches, discovers, develops, manufactures, and sells products in one significant business segment—pharmaceutical products. Lilly manufactures and distributes products through owned or leased facilities in the United States, Puerto Rico, and 25 other countries. The Company's products are sold in roughly 140 countries.  Most of the products Lilly sells are discovered or developed by its own scientists. The focus of Lilly's research efforts is primarily the development of products to prevent and treat human diseases.  Lilly also conducts research to find products to treat diseases in animals and to increase the efficiency of animal food production.

15.    Defendant Sidney Taurel ("Taurel") is Chairman of Lilly and has been since January 1999.  Taurel was Chief Executive Officer ("CEO") from July 1998 to March 2008; President from February 1996 through September 2005; Executive Vice President from 1993 to February 1996; Executive Vice President of the Pharmaceutical Division from 1991 to 1993; and President of Lilly International Corporation from 1986 to 1991.  Taurel held management positions in the Company's international operations based in São Paulo, Vienna, Paris, and London from 1971 to 1986.  Taurel will retire as Chairman and as a director effective December 31, 2008.  By virtue of Taurel's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Taurel participated in the issuance of improper statements,

including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and Lilly shareholders.  Lilly paid Taurel the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| 2007 | $1,717,417 | - | $6,443,000 | - | $600,000 | $4,035,929 | - | $215,044 |
| 2006 | $1,650,333 | $2,764,308 | $5,400,000 | 216,867 | - | - | $1,417,434 | $192,409 |
| 2005 | $1,569,857 | $2,262,163 | $3,689,918 | 255,621 | - | - | - | $102,017 |
| 2004 | $1,501,050 | $1,486,040 | $1,590,120 | 400,000 | - | - | - | $142,574 |
| 2003 | $1,432,860 | $1,193,595 | - | - | 350,000 | - | - | $207,149 |
| 2002 | $1 | - | - | - | 350,000 | - | - | $307,205 |

During the Relevant Period, Taurel sold 319,913 shares of Lilly stock for proceeds of $17,539,716.27. Defendant Taurel is a citizen of Indiana.

16.    Defendant John C. Lechleiter ("Lechleiter") is Chief Executive Officer of Lilly and has been since April 2008.  Lechleiter is also President and a director of Lilly and has been since 2005. Leichleiter was Chief Operating Officer of Lilly from 2005 to April 2008;  Executive Vice President, Pharmaceutical Operations from 2004 to October 2005; Executive Vice President, Pharmaceutical Products and Corporate Development from 2001 to 2004; Senior Vice President of Pharmaceutical Products from 1998 to 2001; Vice President for Development and Regulatory Affairs from 1996 to 1998; Vice President of Regulatory Affairs from 1994 to 1996; Vice President of Pharmaceutical Product Development from 1993 to 1994; and Senior Organic Chemist and held various management positions in England and the U.S. from 1979 to 1993.  By virtue of Lechleiter's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Lechleiter participated in the issuance of improper statements, including the

preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Lilly paid Lechleiter the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|---|---|
| 2007 | $1,149,083 | - | $4,641,000 | - | $390,000 | $2,160,277 | $921,394 | $70,761 |
| 2006 | $1,112,000 | $1,490,080 | $3,510,000 | 140,964 | - | - | $1,156,247 | $68,790 |
| 2005 | $966,383 | $1,039,534 | $1,844,959 | 127,811 | - | - | - | $60,339 |
| 2004 | $894,000 | $603,450 | $795,060 | 200,000 | - | - | - | $45,806 |
| 2003 | $725,625 | $417,657 | - | 120,000 | - | - | - | $41,079 |
| 2002 | $675,000 | - | - | 120,000 | - | - | - | $29,498 |

During the Relevant Period, Lechleiter sold 64,534 shares of Lilly stock for proceeds of $3,642,046.88. Defendant Lechleiter is a citizen of Indiana.

17.     Defendant Simon N.R. Harford ("Harford") is Vice President and Controller of Lilly and has been since May 2006. Harford was also an Executive Director of Investor Relations from January 2003 to May 2006; Finance Director and Chief Financial Officer ("CFO") for Lilly Italy from 1998 to 2000; and an International Financial Associate from 1988. By virtue of Harford's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Harford participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Harford is a citizen of Indiana.

18.     Defendant Breier is Vice President and Chief Medical Officer of Lilly and has been since August 2003. Breier was also Zyprexa product team leader and Vice President of pharmaceutical products. By virtue of Breier's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar,

and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management meetings and via reports and other information provided to him in connection therewith. During the Relevant Period, Breier participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Breier is a citizen of Indiana.

19.    Defendant Karen N. Horn ("Horn") is a director of Lilly and has been since 1987. Horn is also Chairman of Lilly's Compensation Committee and has been since 2005 and a member and has been since 2002. By virtue of Horn's positions at the Company, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Horn participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. During the Relevant Period, Horn sold 2,055 shares of Lilly stock for proceeds of $110,723.40. Defendant Horn is a citizen of Connecticut.

20.    Defendant Alfred G. Gilman ("Gilman") is a director of Lilly and has been since 1995. By virtue of Gilman's position, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Gilman participated in the issuance of improper statements,

including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Gilman is a citizen of Texas.

21.     Defendant Franklyn G. Prendergast ("Prendergast") is a director of Lilly and has been since 1995. Prendergast was also a member of Lilly's Audit Committee from 2002 to 2008. By virtue of Prendergast's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Prendergast participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Prendergast is a citizen of Minnesota.

22.     Defendant Martin S. Feldstein ("Feldstein") is a director of Lilly and has been since 2002. Feldstein is also a member of Lilly's Audit Committee and has been since 2002. By virtue of Feldstein's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Feldstein participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Feldstein is a citizen of Massachusetts.

23.    Defendant Ellen R. Marram ("Marram") is a director of Lilly and has been since 2002. Marram is also a member of Lilly's Compensation Committee and has been since 2002. By virtue of Marram's positions at the Company, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Marram participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Marram is a citizen of New York.

24.    Defendant Kathi P. Seifert ("Seifert") is a director of Lilly and has been since 1995. Seifert is also a member of Lilly's Audit Committee and has been since 2002. By virtue of Seifert's positions at the Company, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to her in connection therewith. During the Relevant Period, Seifert participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Seifert is a citizen of Wisconsin.

25.    Defendant Sir Winfried Bischoff ("Bischoff") is a director of Lilly and has been since 2000. Bischoff was also Chairman of Lilly's Audit Committee from 2002 to 2005. By virtue of Bischoff's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business

of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Bischoff participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Bischoff is a citizen of the United Kingdom.

26.    Defendant J. Erik Fyrwald ("Fyrwald") is a director of Lilly and has been since 2005. Fyrwald is also a member of Lilly's Compensation Committee and has been since 2005. By virtue of Fyrwald's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Fyrwald participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Fyrwald is a citizen of Iowa.

27.    Defendant J. Michael Cook ("Cook") is a director of Lilly and has been since 2005. Cook is also Chairman of Lilly's Audit Committee and has been since 2006 and a member and has been since 2004. Cook was a member of Lilly's Compensation Committee from 2004 to 2005. By virtue of Cook's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board

11

meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Cook participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Cook is a citizen of Connecticut.

28. Defendant Charles E. Golden ("Golden") was CFO, Executive Vice President and a director of Lilly from 1996 to April 2006. By virtue of Golden's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Golden participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Lilly paid Golden the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | Change in Pension Value | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $285,900 | $325,640 | $550,000 | - | $134,878 | $475,494 |
| 2005 | $841,600 | $826,872 | $1,127,453 | 78,107 | - | $51,247 |
| 2004 | $813,210 | $548,917 | $511,110 | 120,000 | - | $42,400 |
| 2003 | $789,540 | $444,117 | - | 120,000 | - | $44,390 |
| 2002 | $789,540 | - | - | 120,000 | - | $39,038 |

During the Relevant Period, Golden sold 72,221 shares of Lilly stock for proceeds of $3,967,493.29. Defendant Golden is a citizen of Indiana.

29. Defendant August M. Watanabe ("Watanabe") was a director of Lilly from 1994 to June 2003. Watanabe was also Executive Vice President, Science and Technology of Lilly from 1996 until at least March 2003. By virtue of Watanabe's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar,

and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Watanabe participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Lilly paid Watanabe the following compensation:

| Fiscal Year | Salary | Securities Underlying Options | All Other Compensation |
|---|---|---|---|
| 2002 | $820,080 | 120,000 | $37,232 |

Defendant Watanabe is a citizen of Indiana.

30.      Defendant George M.C. Fisher ("Fisher") was a director of Lilly from 2000 to April 2008. Fisher was also a member of Lilly's Compensation Committee from 2002 to 2008. By virtue of Fisher's positions at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith. During the Relevant Period, Fisher participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders. Defendant Fisher is a citizen of Arizona.

31.      Defendant Alva O. Way ("Way") was a director of Lilly from 1980 to April 2002. By virtue of Way's position at the Company, she knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board

meetings and committees thereof and via reports and other information provided to her in connection therewith.  During the Relevant Period, Way participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders.  Defendant Way is a citizen of Connecticut.

32.     Defendant John Rose ("Rose") was a director of Lilly from 2003 to October 2005.  By virtue of Rose's position at the Company, he knew, consciously disregarded, was reckless and grossly negligent in not knowing or should have known the adverse, non-public information about the business of Lilly, specifically, that Zyprexa causes weight gain, high blood sugar, and diabetes, as well as its finances, markets and present and future business prospects, via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at Board meetings and committees thereof and via reports and other information provided to him in connection therewith.  During the Relevant Period, Rose participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and Lilly shareholders.  Defendant Rose is a citizen of the United Kingdom.

33.     The defendants identified in ¶¶15-16, 19-32 are referred to herein as the "Director Defendants."  The defendants identified in ¶¶15-18, 27-29 are referred to herein as the "Officer Defendants."  The defendants identified in ¶¶15-16, 19, 27 are referred to herein as the "Insider Selling Defendants."  Collectively, the Director Defendants, the Officer Defendants and the Insider Selling Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

34.     By reason of their positions as officers, directors and/or fiduciaries of Lilly and because of their ability to control the business and corporate affairs of Lilly, the Individual Defendants owed Lilly and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage Lilly in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of

Lilly and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

35.     Each director and officer of the Company owes to Lilly and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's data showing that Zyprexa causes weight gain, high blood sugar, and diabetes, the importance of Zyprexa to the Company's revenue stream, the effect of a slowdown in Zyprexa sales to the Company's revenue stream including, margins, operations, performance, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information. In addition, the Individual Defendants had a duty not to direct or allow the Company to market Zyprexa to state Medicaid for unproven and potentially unsafe uses.

36.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lilly, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company. Because of their advisory, executive, managerial and directorial positions with Lilly, each of the Individual Defendants had access to adverse non-public information concerning the Company's pharmaceutical products.

37.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lilly, and was at all times acting within the course and scope of such agency.

38.     To fulfill their fiduciary obligations, the officers and directors of Lilly were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Lilly were required to, among other things:

(a)     refrain from acting upon material inside corporate information to benefit themselves;

- 15 -

(b)    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c)    conduct the affairs of the Company in an efficient, business like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d)    properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's pharmaceutical products, including drug sale prospects, and ensuring that the Company maintained an adequate system of controls such that the Company's public statements regarding the Company's pharmaceutical products would be true and accurate at all times;

(e)    remain informed as to how Lilly conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

(f)    ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable federal, state and local laws, rules and regulations.

39.    Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Lilly, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period has been ratified by the remaining Individual Defendants who collectively comprised all of Lilly's Board during the Relevant Period.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.     By engaging in the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breach of their respective duties.

41.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its financial results, in order to allow defendants to artificially inflate the price of the Company's shares; (ii) maintain the Individual Defendants' executive and directorial positions at Lilly and the profits, power and prestige that the Individual Defendants enjoyed as a result of these positions; and (iii) deceive the investing public, including shareholders of Lilly, regarding the Individual Defendants' management of Lilly's operations, the Company's financial health and stability, and future business prospects, specifically related to the public statements regarding the Company's pharmaceutical products that had been misrepresented by defendants throughout the Relevant Period. In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

42.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct commencing by at least March 2002, and continuing thereafter. During this time the Individual Defendants caused the Company to conceal the truth about facts showing that Zyprexa causes weight gain, high blood sugar, and diabetes, the importance of Zyprexa to the Company's revenue stream, the effect of a slowdown in Zyprexa sales to the Company's revenue, and that the Company was improperly marketing Zyprexa to states for unproven and potentially unsafe uses. In addition, defendants also made specific, false public statements regarding the Company's pharmaceutical products and future business prospects, as alleged herein.

43.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets and unjust enrichment; to conceal

- 17 -

adverse information concerning the Company's operations, the Company's pharmaceutical products, and future business prospects; and to artificially inflate the price of Lilly common stock so they could: (i) dispose of over $25 million of their personally held stock; and (ii) protect and enhance their executive and directorial positions and the substantial compensation and prestige they obtained as a result thereof.

44.    The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently misrepresent its financial results. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

45.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## BACKGROUND

46.    The first generation of antipsychotic drugs had such terrible side effects – like dry mouth, stiffness, and trembling – that people often just stopped using them. Zyprexa, the scientific or generic name of which is olanzapine, is a second-generation "atypical" antipsychotic medication, which many patients consider more tolerable. Zyprexa was the first atypical antipsychotic medication to be approved for short-term treatment of bipolar mania. Zyprexa acts as a mood stabilizer. For long-term schizophrenia treatment it helps to control hallucinations, delusions, apathy, and withdrawal.

47.    Zyprexa was approved by the FDA in 1996 for sale in the United States. Since that time, Zyprexa has been prescribed to over 12 million people worldwide. The class of antipsychotic drugs also includes Clozaril, Risperdal, Seroquel, Geodon, and Abilify— all of which are sold by Lilly's competitors.

48.    Throughout the Relevant Period, Zyprexa was Lilly's largest-selling drug and critical to the Company's success. Throughout the Relevant Period, Zyprexa constituted roughly 30% of Lilly's

total revenue for each year. The following chart details the critical importance of Zyprexa to the Company in terms of sales:

|      | Zyprexa Sales | Total Sales |
|------|---------------|-------------|
| 2002 | $3.689 B      | $11.077 B   |
| 2003 | $4.277 B      | $12.583 B   |
| 2004 | $4.419 B      | $13.858 B   |
| 2005 | $4.202 B      | $14.645 B   |
| 2006 | $4.364 B      | $15.691 B   |

49.    At the beginning of the Relevant Period, Lilly, under defendants' direction, claimed that Zyprexa did not cause diabetes-related side effects. After the publicly available clinical data rendered these claims untenable, defendants directed Lilly to disseminate public statements claiming instead that Zyprexa did not cause more side effects than its competitors.

50.    On May 30, 2001, the *Indianapolis Star* published an article reporting on Lilly's claim that Zyprexa did not cause diabetes to any greater extent then its competitors:

Study shows Zyprexa is no more linked to diabetes than rivals

A new study shows no differences among competing antipsychotic drugs on the question of whether they cause diabetes.

The study by Eli Lilly and Co. seems to clear its own antipsychotic, Zyprexa, of a charge that it's lined to diabetic conditions more than its rivals.

**"This is the best study to date on this issue," said Dr. Alan Breier, Zyprexa team leader for Lilly. "I think it should be reassuring to patients and doctors."**

## IMPROPER STATEMENTS

51.    By virtue of their fiduciary duties of care, good faith and loyalty the Individual Defendants had a responsibility to ensure that the Company's Relevant Period Statements fairly presented, in all material respects, the Company's operations and financial condition, including the prospects of its pharmaceutical products. To be capable of adequately carrying out these duties, the Individual Defendants must become knowledgeable and understand the material, non-public information to be either disclosed or omitted from the Company's public statements.

52.    As officers of Lilly, defendants Taurel, Lechleiter, Harford, Breier, Golden and Watanabe had ample opportunity to discuss the Company's pharmaceutical products with their fellow officers at management meetings and via internal corporate documents and reports. As directors of Lilly, defendants Taurel, Lechleiter, Horn, Gilman, Prendergast, Fisher, Feldstein, Marram, Seifert,

Bischoff, Fyrwald, Cook, Golden, Watanabe, Way and Rose had ample opportunity to discuss the Company's pharmaceutical products with management and fellow directors at any of the Board meetings that occurred during the Relevant Period as well as at meetings of committees of the Board. In addition, as members of the Board's Science and Technology Committee, defendants Gilman, Prendergast, Watanabe, Fyrwald and Lechleiter were charged with overseeing the development of Lilly's pharmaceuticals including Zyprexa, and had ample opportunity to discuss the Company's pharmaceutical products with their fellow directors at management meetings and via internal corporate documents and reports. In spite of their fiduciary obligations, the Individual Defendants negligently, recklessly, and/or intentionally caused or allowed, by their actions or inactions, the improper statements summarized below to be disseminated by Lilly to the investing public and the Company's shareholders during the Relevant Period.

53. Lilly filed a Form 10-K405 with the SEC for fiscal year 2001 ending December 31, 2001 on March 28, 2002,. In this 10-K405, Lilly stated that its worldwide sales for 2001 had increased by 6%, to $11.54 billion. The reason for this growth in sales, according to Lilly, was "…Zyprexa, a treatment for schizophrenia and related psychoses." The Company went on to report that:

> Zyprexa had worldwide sales of $3.09 billion in 2001, representing an increase of 31 percent. Sales in the U.S. increased 29 percent, to $2.18 billion. Zyprexa's sales continued to experience strong growth in the face of an additional competitive product in the U.S. Sales outside the U.S. increased 38 percent, to $910.5 million, benefiting, in part, from the launch of Zyprexa in Japan during the second quarter of 2001.

54. Shortly thereafter, on April 15, 2002, the Individual Defendants caused or allowed Lilly to conduct a conference call with financial analysts that addressed findings that Zyprexa had been linked to nine cases of diabetes in Japan. Defendant Harford minimized the significance of these findings as follows:

> We received indication on Friday from the MHLW (ph) in Japan that there likely will be a label change for Zyprexa in the Japanese market due to nine reported cases of severe hypoglycemia, the majority of whom had known or suspected diabetes, including two deaths from diabetic coma among the 137,000 patients treated with Zyprexa since the launch in Japan in June last year.

> We would like to emphasize that the Ministry of Health, Labor and Welfare has not yet issued its formal instruction. However, it is likely the label change will include a contraindication for patients with diabetes or a history of diabetes.

> We respect and share the MHLW's (ph) concerns for the well-being and safety of patients and recognize the Japanese agency's jurisdiction. However, we are not in

agreement, since the label change might result in Zyprexa being withheld inappropriately from thousands of patients with diabetes and schizophrenia in Japan.

In the more than eight million treated globally with Zyprexa to date, there have been cases of diabetic ketoacidosis, *but these have been very rare events* as represented in our current global label including the U.S., EU (ph) and Japanese labels. Both schizophrenia and bipolar disorders carry a two to four-fold higher risk for diabetes irrespective of antipsychotic treatment when compared to the general population. It has been suggested that there is a slightly increased risk of hypoglycemia associated with the use of atypicals including Zyprexa.

However, it is important to keep in perspective that the benefits to schizophrenia patients *far outweigh the very limited risk* of hypoglycemia. It is clear that any such label change would deny patients with diabetes and schizophrenia in Japan a valuable treatment option, and it is possible it will have a negative impact on the sales potential of Zyprexa in Japan. As far as the rest of the world is concerned, we have contacted the major regulatory bodies and continue to believe existing labels in those countries fully address this topic.

\* \* \*

55.     During this same call Defendant Lechleiter added that:

[S]ince we've launched the product we've been in continuous discussions with regulators all over the world as we continue to refine and update our label. The events referenced in Japan are not new events, and we continue based on the discussions as recently as the end of last week, with our top people within the review division at the FDA and also within the European regulatory world. *We continue to believe that our labels, based on the global data, in those two parts of the world, will continue to stand as they are and support the use of – continued use of Zyprexa in patients with diabete*s.

**Ensuing Product Liability Litigation**

56.     Following the publication of the Japanese study finding a correlation between Zyprexa and diabetes, patients who had allegedly been harmed by Zyprexa began filing product liability lawsuits against Lilly alleging that Zyprexa caused diabetes. On April 16, 2002, the *Indianapolis Star* reported on these lawsuits as follows:

At least five lawsuits accuse Lilly of failing to warn that its drug, Zyprexa, can induce diabetes, a blood-sugar disorder. Plaintiffs seek damages of up to $35 million.

\* \* \*

To confront the charge, Lilly has sponsored two patient trials to investigate the diabetes link to Zyprexa and opened its files of Zyprexa patients to an outside researcher to study the issue.

"We take any side effects of Zyprexa extremely seriously," said Dr. Alan Breier, vice president of pharmaceutical sales at Lilly and head of the Zyprexa product team. "We're committed to this issue, to turning over every stone, seeing if something is important. More research is needed by us and by others."

\* \* \*

Lilly "*knew or should have known that the product was extremely dangerous and unsafe*," says the first of the lawsuits, filed in December.

\* \* \*

Lilly spokeswomen Marni Lemons said the company will argue in court that Zyprexa's safety is supported by "a substantial body of scientific evidence."

"*There is no evidence anybody has produced to date that says antipsychotic drugs cause diabetes*," Lilly physician Breier said.

## Additional Improper Statements

57.     *Reuters* published an article on May 7, 2002 that contained statements from Lilly casting doubt as to the link between Zyprexa and diabetes.  The article stated:

American drug maker Eli Lilly defended its top-selling anti-psychotic medicine, Zyprexa (olanzapine) on Tuesday following reports that a number of patients had gone into a diabetic coma after taking the drug.

"Schizophrenia and bipolar disorder patients have a two-to-four fold higher risk for diabetes when compared to the general population *irrespective of the anti-psychotic prescribed*," the company said in a statement.

"Studies in the United States and Europe have shown that the incidence of diabetes *appears similar* across a wide variety of anti-psychotic medications."

58.     On July 3, 2002, *ESPICOM Business Intelligence* published an article regarding research by Duke University that linked Zyprexa with the onset of diabetes.  The report included the following:

Research from Duke University Medical Center, published in the 2nd July issue of *Pharmacotherapy*, suggests there might be a link between at least one drug used to treat schizophrenia and the onset of diabetes.  Eli Lilly's drug, Zyprexa (olanzapine) belongs to a relatively new family of medications called atypical anitpsychotics, which are used to treat schizophrenia, paranoia and manic-depressive disorders.  *The researchers found metabolic abnormalities ranging from mild blood sugar problems to diabetic ketoacidosis and coma in patients who had been prescribed olanzapine, most of whom were otherwise not known to be diabetic.*

59.     Just one month later, on August 1, 2002, Lilly flatly denied that there was any link between Zyprexa and diabetes in article published by *Associated Press Online*.  The article included the following:

Shares of Eli Lilly & Co. dropped Thursday amid concern that its drug to treat schizophrenia, Zyprexa, may be increasingly linked to side effects such as diabetes.

\* \* \*

Lilly spokeswoman Marni Lemons said that the study published in the July 2 issue of the journal Pharmacotherapy also raised concerns about other anti-psychotic drugs and *did not link Zyprexa as a cause of diabetes or acidosis, another side effect*.  Acidosis is a condition where patients suffer from headaches, nausea and vomiting that is typically caused by excessive acid production in the body.

"High incidences of diabetes have been reported in cases of severe mental illness for many, many years, long before the current anti-psychotics were developed." Lemons said. "This suggests that this population is at risk."

"That makes it obvious that this is a problem, and it may or may not be associated with the drugs," she said. "That's what we're trying to get to the bottom of."

60.     Thereafter, on October 23, 2002, the Company conducted a second conference call with financial analysts to address the correlation between Zyprexa and the onset of diabetes. During this call, defendants yet again asserted that Zyprexa did not cause more side effects than its competitors. Lilly made the following representations during the call:

Tim Anderson – *Prudential Securities*

On the issue of Zyprexa and the, um, the rare diabetes side effect in Japan, the label's changed and you have talked about that in the UK or in Europe, I believe the same thing happened that Zyprexa has been labeled kind of out of line with other products. You can confirm the same recently occurred in Australia and then in the U.S., um, you know, seems like a likely outcome could be the same, which is that maybe all products get some general label changes but that Zyprexa gets a disproportionate change, and I guess my question after that would be does really – does any of this really make a difference in markets other than Japan?

\* \* \*

Craig [Hartman] – *Eli Lilly and Company* – *Investor Relations*

Yeah, Tim, um, I think that we believe that if there is going to be a label change, that, um, it would be something that would be across the whole spectrum of atypical antipsychotics in the U.S. We know that the FDA is taking a look at the class and they're conducting a prospective study at the VA hospitals, and, um, we think that based on the evidence that we have seen in many studies, not just the studies that we have funded, um, that there is little or no difference between antipsychotics and risk of, um, diabetes, *so we don't think there is going to be a differential between Zyprexa and the other atypicals.*

Simon Harford – *Eli Lilly and Company* – *Director of Investor Relations*

And I think it's fair to say, just to add to that, that we feel very confident at this stage that *there is absolutely no rationale* for why Zyprexa would be singled out in the United States; um, for a label change, different from the other atypical antipsychotics. Next caller, please.

\* \* \*

Simon Harford – *Eli Lilly and Company* – *Director of Investor Relations*

But what I can say about Zyprexa is we are absolutely convinced that it will continue to be the number one, um, atypical antipsychotic out there from an efficacy standpoint, um, we believe that very, very strongly, and we believe, given the complexity of this disease state, that at the end of the day will be what will be the deciding factor, um, rather than the sort of side effect profile because *Zyprexa has an excellent side effect profile.*

\* \* \*

Abe Bronting – *Glenview Capital*

Um, there was an article published by Elizabeth Kohler from the FDA about Zyprexa-diabetes related issues, reporting 23 deaths. In that article the authors state that, um, although many of them hyperglycemic, associated with many of the newer antipsychotics, it says the majority of published cases implicate clozapine or olanzapine. You seem to indicated that you believe these side effects are more broadly and equally associated with the atypicals. I wonder if your belief is, based on any additional data that you know about, that has not been published, that is available to the FDA or is it simply your hope that all atypicals will be equally indicted?

\* \* \*

Heidi Straub – *Eli Lilly and Company – Investor Relations*

With respect to the, um, [inaudible] study, that was actually a retrospective study where he they were going back and examining spontaneous event reports in a bed watch database. That was not a prospective study, and if you read through the conclusions of the author, you will read in there they indicate even in that study you can't draw any type of conclusions about causality at the result of the study that was conducted and, yes, ***there have been several additional studies supporting the comparable rates argument,*** including studies that have been conducted outside of Lilly. There was a Janssen study conducted in Canada that also came up with support for the comparable rates, um, around risk of diabetes.

61.     *Internal News Medicine* subsequently published a report on December 15, 2002, addressing the connection between Zyprexa and the onset of diabetes. The article stated as follows:

Signs or exacerbations of diabetes in patients taking the atypical antipsychotic olanzapine might be related to the drug, according to authors who analyzed data from several medical databases.

\* \* \*

When asked to comment on these two studies, an Eli Lilly spokesperson said ***that the risk of diabetes is higher in patients with mental illness, a finding that has been seen in studies dating back to the 1920s. The diagnosis of many cases within 6 months of starting [sic] the drug probably reflects the high incidence of unrecognized diabetes in this population,*** she added.

62.     The negative press for the Company continued on April 14, 2003, when the *Wall Street Journal Europe* published an article regarding the relationship between Zyprexa and diabetes. This article contained further statements from a senior researcher at the Company that yet again claimed that Zyprexa does not cause diabetes. The article stated in pertinent part that:

FOR MORE THAN four years, the U.S. Food and Drug Administration has been mulling a mystery: Is a new generation of big-selling drugs for severe mental illness causing diabetes and, in rare cases, killing patients?

\* \* \*

The company says there isn't conclusive evidence that Zyprexa caused the dire side effects. But pointing to some reports of complications with rival drugs, Lilly also says that if there is a problem, it affects the entire class of medications, known as atypical antipsychotics.

\* \* \*

The FDA in 1999 launched a broad review of atypical antipsychotic drugs then on the market, after a number of academic studies and individual reports of problems had accumulated. By mid-2000, the FDA had gathered some information on the possible link between atypical antipsychotics and diabetes, but making even rudimentary findings proved difficult, agency officials say.

A team of researchers, lead by Elizabeth Koller, a former FDA official, and Dr. Doraiswamy of Duke, cataloged the number of diabetes-related complications reported to the FDA in patients taking Zyprexa and Risperdal. Based on this and other research, Johnson & Johnson says Risperdal has a lower risk of diabetes than Zyprexa. But Lilly says its research undercuts this contention. A study led by a Lilly consultant looked at prescription records of AdvancePCS, the giant pharmacy-benefits manager. Published in February 2003 issue of the Journal of Epidemiology, the study found that patients on a selection of antipsychotics were two to three times as likely as the general population to have diabetes. But the study found no difference in the rate of diabetes among patients taking the various drugs.

Robert W. Baker, a senior clinical research scientist at Lilly, says the company has spent millions of dollars on research evaluating the diabetes question. Roughly a quarter of Zyprexa patients gain more than 11 kilos while on the medication, Lilly researchers say, and obesity is linked with diabetes. But Dr. Baker says *the evidence suggests Zyprexa itself doesn't cause diabetes-related problems*. He says the research suggests that the Zyprexa patients who developed diabetes probably had elevated blood-sugar levels before taking the medication.

63.     The *Indianapolis Star* continued its coverage of this issue on April 23, 2003, when it published an article discussing a study questioning the link between Zyprexa and diabetes. Defendants, realizing that there was an opportunity to potentially deflect some of the negative attention on the Company, immediately embraced this study. The *Indianapolis Star* reported as follows:

A major study of the link between diabetes and newer antipsychotic drugs shows patients taking Eli Lilly and Co.'s Zyprexa have the lowest rates of new cases of diabetes.

\* \* \*

Lilly spokeswomen Marni Lemons said the study "confirms what we said all along: *There is no consistent difference in the risk of diabetes among patients treated with different atypical. This study happens to show us (Zyprexa) lower than the others.*

64.     The *Wall Street Journal* thereafter published a letter to the editor from Lilly on April 28, 2003. In the letter defendants yet again averred that there was no link between Zyprexa and diabetes. The letter included the following:

At Eli Lilly and Co., we are disappointed that your April 11 article "Drug Debate: New Antipsychotics Pose a Quandary For FDA, Doctors" missed an opportunity to shed light on an important clinical issue.

\* \* \*

**Scientific data has not established that Zyprexa – or any antipsychotic medication – causes diabetes.**

65.     Lilly subsequently conducted a third conference call with financial analysts during which defendants renewed their efforts to persuade the public that Zyprexa did not cause diabetes to a greater degree than Lilly's competition. The call, which took place on July 24, 2003, included the following statements:

John Lechleiter – *Eli Lilly – EVP, Pharmaceutical Products and Corporate Development*

\* \* \*

First of all, **we continue to believe in the substantial body of scientific evidence that supports the – the Askazine (ph) safety profile for this product.** They have been used in over 11 million patients. The message that we are communicating broadly to our physician customers, centers around the following point. There is an epidemic of diabetes in the U.S. population with about a 2 to 4 fold greater rate of diabetes among patients who have serious mental illness. This is irrespective of drug treatment.

The available data do not establish a causal link between diabetes and Zyprexa, or any other antipsychotic for that matter. **We conducted studies that showed that Zyprexa did not decrease pancreatic insulin relief, or unlike certain other medicines, have a direct impact on insulin sensitivity. The fact is that head-to-head clinical studies, and epidemiology studies, don't show any consistent or clinically significant difference in the risk of diabetes among patients treated with different atypical anti-psychotics, despite differences in their respective weight gain profiles.**

In a comprehensive analysis of our own data which covers studies, many of them over a year long, involving thousands of patients, elevated baseline random glucose levels and presence of multiple risk factors for diabetes were significant predictors of treatment-emergent diabetes, whereas weight gain and anti psychotic drug assignment, whether Zyprexa or any other drugs we may have studied as a comparator were not predictors. Risk for diabetes should, therefore, be considered among patients with serious mental illness regardless of medication choice.

This is the fundamental, at a high level, composite of the way we look at this and the basic message that we are communicating in all of our communication supported by a growing body of evidence and solid published data. **I think our confidence in Zyprexa remains very, very high.**

66.     Lilly conducted yet another conference call with financial analysts on September 5, 2003, to address the risk of diabetes among patients taking Zyprexa. Defendants stressed that there were no

- 26 -

differences in the risk of diabetes among patients treated with Zyprexa compared to other anti-psychotics. Defendants made the following statements during the call:

Gerhard Mayr – *Executive Vice-President Pharmaceutical Operations – Eli Lilly and Company*

\* \* \*

Since our competitors can't dispute Zyprexa's efficacy, it is no surprise some of them are going after potential side effects. We have talked to you in the past about the comprehensive body of data supporting the fact that ***there are no consistent or clinical significant differences in the risk of diabetes among patients treated with different atypical anti-psychotics***.

\* \* \*

Matthew Anderson – *Prudential*

Matthew Anderson of Prudential. A few questions. You know, on the press release you talk about acute preclinical toxicology. And it seems like with you're, you know, you're choice of words here is you're trying to tell us something about the preclinical tox.

But acute does not seem to be a phrase that's used often in these toxicology circles and I can't figure out what exactly you're saying here. Are you saying that the preclinical tox is going to be a short term tox as opposed to something longer? Like, you know, longer animal studies? That's one question.

The second question is on the VA study, you know, you've said it basically ends the debate on diabetes. But if I, you know, what am I missing here? Because this is essentially retrospective chart review.

And as we've seen with other drug categories like hormone replacement therapy, you can be dead wrong in a retrospective look as opposed to something that's prospective. So, it seems like, really, something more definitive will come from the Katy (ph) trial for example.

What am I missing here? And if you're so confident, does that kind of imply that we're not likely to see any adverse label changes at any point in the future regarding this diabetes issue and any of the atypicals?

And then last question has to do with the Medicare drug benefit. And maybe this is best answered by Sydney. Can you just handicap the odds that you think will reach a consensus on a Medicare drug benefit in either '03 or '04? Is it 50/50 or something better than that?

\* \* \*

Simon Harford – *Executive Director of Investor Relations – Eli Lilly and Company*

Yes, I think the point's well taken. I would say that -- the way I might phrase it is I think this shifts the debate – this particular study – because it was very important to the FDA.

There are other studies that are very similar. And those studies, by the way, are very consistent with the results. In fact, there's yet another VA study by very reputable

investigators that will be presented in October – different patient group – which will again make the same point.

      *That there are very little differences among the atypicals when it comes to rates of diabetes.* Very important point to remember about these particular kinds of studies. They do not test cause and effect. They demonstrate association.

      So, why it's so important and why it's so important that the debate be shifted -- and it relates to what I was talking about in my previous remarks – that there's been almost a uni-focused drumbeat from our competitors.

      Not talking efficacy. Talking about one topic: diabetes. And that's come from supporters of Seroquel, Risperdal, et cetera. I think it's going to be more challenging for those companies to continue on that uni-focus drumbeat given the importance of this study and the impact that it's going to have.

      And where the debate gets shifted is that it now shifts over to efficacy where we've been saying it belongs from the very beginning. That this study would help to level the playing field by still a very, very important issue, we're continuing to be very kind of scientifically involved on that topic.

      But it shifts the debate over towards, now, efficacy. And quite frankly, in over six years with Zyprexa, I've not heard our competitors talking about efficacy. We've been the lone voice out there supporting a strong efficacy message.

      We think now that that's where the real debate will be. It's what's bringing the best benefit to patients? What's taking patients the furthest along in their roads to recovery? *And as the debate gets very scientific and away from some of the emotions associated in misinformation of diabetes and back to efficacy, the big winners in the end are going to be patients.*

      One of the liabilities of some of the emotional activity around diabetes is that patients were getting afraid. They were becoming fearful as were prescribers and then switching to Risperdal or Seroquel, for example, thinking that they had a safe harbor over there.

      *And the fact is, what we've been saying is that diabetes goes with the territory. It goes with chronic mental illness.* Let's learn more about it. Let's know how to manage it, but choose the best treatment for the core psychiatric illness for the schizophrenic and the bipolar.

      And when the debate gets there -- when that shift occurs – again, the big winners are patients.

## Lilly is Compelled by the FDA to Post Diabetes Warning on Zyprexa

      67.    The *Indianapolis Star* subsequently reported on September 18, 2003, that the FDA was going to compel Lilly to warn patients about the correlation between diabetes and Zyprexa notwithstanding the defendants' numerous assertions that no such link existed. The article stated in its pertinent part as follows:

      Eli Lilly and Co. will have to *post a warning of a diabetes* risk on its best-selling drug Zyprexa.

\* \* \*

The Food and Drug Administration ordered Lilly and other manufacturers of so-called atypical antipsychotics to draw up the warning even though it admitted "the relation between atypical antipsychotic use and diabetes mellitus adverse events has not been completely described."

\* \* \*

The warning "is a positive thing" that Lilly prefers over the alternative of addressing the issue through its sales force talking to doctors and responding to competitors' accusations, Lemons said. "This is not a good drug-bad drug issue," she said. "This is a patient care issue – raise awareness, raise understanding and provide education."

68.    Lilly conducted a conference call with financial analysts on October 22, 2003, to address the effect of the FDA's order on the Company's business. The call included the following statements:

[*SunTrust* Analyst:]

My question is [re] Zyprexa. Simon, could you give us an idea of how much there was in the quarter and regarding class labeling for the atypicals, if there's a holdout as there appears to be from [your] friends from Pfizer, will you make that change and disseminate that information according to an updated label? Just give me your thoughts in that regard.

Simon Harford – *Executive Director of Investor Relations – Eli Lilly and Company*

**In terms of Zyprexa, the topic of wholesaler stocking was really very minimal and it would have had in for 1 or 2 percentage point impact maximum for the quarter. In terms of the topic of class labeling, you know, the agency clearly requested class labeling, based on a large and compelling body of evidence. We have actually, already, adopted that label change.** We're [aware] that – we're [aware] of other manufacturers of atypicals have not yet adopted the FDA's label change my [under-standing] the FDA did not impose any specific deadline on compliance but remember in an effort to keep up with Zyprexa and the treatment of Bipolar Disorder a number of the other competitive atypicals have applications for bipolar mania currently under review with the FDA. Many with action dates either this quarter or next quarter. So, we would expect that these approvals will be subject to the new class warning statement.    Also, recently, Health Canada requested that manufacturers get updated information on [hyperglycemia] and value dating our position on this topic. And, in fact, Health Canada indicated that the label will be required for new market entries as well as those currently approved in Canada. So, you know, we'll have to wait and see what happens, but our expectation would be that, quite frankly, unless we see some for the of document to the contrary, or we see a new indication approved about the requested label change, sort of not included, that this is exactly as the agency suggested, to us, in their request, class labeling. Next caller, please?

69.    Lilly conducted another conference call with financial analysts on January 29, 2004. During this call spokesmen for the Company asserted that schizophrenics, in general, have a higher rate of diabetes and that Zyprexa does not substantially contribute to that rate. The call included the following statements:

C.J. Sylvester – *UBS Warburg*

Just a question on the recent announcement out of the ADA in terms of the risk associated with Clozaril and Zyprexa, with regard to the other antipsychotics on the market, clearly that looks like it's a step back from where we were with the FDA. And just your interpretation of Pfizer and probably Bristol not really going along with the change in the hypoglycemia in the label. If you could make comments on that?

Simon Harford – *Executive Director of Investor Relations – Eli Lilly and Company*

Sure, C.J. In terms of the opinion paper that was issued on Tuesday by the ADA, which was basically the result of a sort of a one- or two-day meeting back in November, that is an opinion paper of a panel of psychiatrists and endocrinologists. We agree with many things in that paper, specifically of great importance, and in line with what the FDA had said, we obviously favor monitoring of schizophrenic patients, concerning the risk of diabetes *given what we know about the higher incidence of diabetes in the population of schizophrenics as a whole*.

Our concern with that report was more related, quite frankly, to one of the conclusions that there are differing in the opinions of these experts, differing rates or incidences of diabetes amongst the second generation antipsychotics or atypicals because the whole body of evidence does not support that in our view. The FDA clearly did an exhaustive two-year review of the data before coming out with its request for mandated changes in labels for all atypical antipsychotics and concern that ultimately sort of leads to confusion among patients and prescribers.

70.     Lilly conducted another conference call with financial analysts on January 29, 2004. During this call defendants once again claimed that Zyprexa did not cause diabetes in any greater number than Lilly's competition. The call included the following statements:

Richard Evans – *Sanford C. Bernstein – Analyst*

Okay. The final one on Zyprexa, there are two cards here kind of asking for tactical detail on how you are responding at the physician sales rep level to challenges about obesity, weight gain, link with diabetes, things like that. How are the salespeople being trained – (Multiple Speakers) – the message?

Sidney Taurel – *Eli Lilly – Chairman, President, CEO*

As I mentioned briefly earlier, even though the FDA has concluded, based on all the evidence, that there are no significant – *there are no differences between the various atypical antipsychotics in terms of potential associations with diabetes* and indeed all of them have respected that in a class label with the exception at this stage of Geodon, but all the other products have reflected the FDA's position in their labeling. In spite of that, there is still, in the physician's mind, an association more specific to Zyprexa, but I think it is related to the fact that *Zyprexa does cause some more obesity, some more weight gain that the other antipsychotics and people make the natural correlation between obesity and diabetes*.

So, I think what we are doing, at the interaction level with the physician, is first help them deal with the issue of potential weight gain upfront; secondly, helping them with the choice of the appropriate patient, where they will really benefit from the high efficacy, which is recognized very broadly by physicians, and then perhaps in those areas where they are more concerned about weight gain or potential diabetes and the efficacy is not that critical, where they can use another product. I think we're moving more and

more in that direction, as well as I mentioned earlier, using the new indications that we have in bipolar, Symbyax, and the new forms to drive the sales growth.

71.    Lilly conducted a conference call with financial analysts on July 22, 2004 to address the decline in sales of Zyprexa. This call included the following statements:

Craig Hartman – *Eli Lilly – Investor Relations Manager*

Thank you, Jim. I will review the performance of our key neuroscience and oncology products, starting with Zyprexa.

Zyprexa sales grew 16% to $1.212 billion for the quarter. During the second quarter, U.S. sales increased 7% to $696 million. Sales outside the U.S. were up 31% to $516 million.

***U.S. total prescription volume for Zyprexa was down nearly 13% in the second quarter as a result of strong competition in both schizophrenia and bipolar disorders and concern among some physicians about weight gain and the risk of treatment emergent diabetes.***

72.    Lilly conducted a conference call with financial analysts on April 18, 2005 to address the Company's marketing of Zyprexa. The following statements were made during this call:

Jim Ward – *Eli Lilly and Company – Executive Director of Investor Relations*

In terms of some of your other questions, on-label/off-label usage and so forth, ***clearly the majority of usage for Zyprexa is on-label, primarily with the schizophrenia and bipolar indications, and we do not have great granularity there in terms of the mix between the two, that type of data is more difficult to come by.***

And in terms of what we're hearing from the doctors, the anecdotal feedback and the direct feedback from the physicians has been very positive. They are very pleased with the new marketing messages that we have, the forthcoming nature that we have with Zyprexa in terms of helping them understand which patients will greatly benefit from the efficacy which Zyprexa offers, and also with the transparency regarding any incidents of weight gain and then how to be monitoring for diabetes across patients of all types who are using atypical drugs, not just Zyprexa. And so putting together a program proactively with the physicians, I think not only helps gain credibility for the company, but also helps the physicians feel well-tooled for providing the best patient care for the patients that they're seeing.

**The Company Agrees to Settle Certain Product Liability Lawsuits**

73.    The Company thereafter agreed to settle some of the thousands of pending product liability lawsuits, but the defendants continued their concealment of the known risks surrounding Zyprexa, parroting their previous assertions that their top-selling product caused no higher risk of diabetes than their competitor's drugs. Moreover, defendants asserted that they were settling the

product liability lawsuits as a favor to doctors. Specifically, they claimed that they did not want the lawsuits to interfere with doctor's treatment decisions.

74.    The *New York Times* reported on June 10, 2005, that the Company had settled certain lawsuits filed by people who claimed that they developed diabetes and other diseases after taking Zyprexa. The article contained the following:

> Eli Lilly & Company said last night that it had agreed to pay $690 million to settle about 8,000 lawsuits filed by people who claimed they developed diabetes and other diseases after taking Zyprexa, a medication for schizophrenia and bipolar disorder that is Lilly's biggest-selling drug.

> The settlement will cover 75 percent of all the Zyprexa-related suits against Lilly in the United States, according to the company, which said it would continue to defend the other cases. After lawyers' fees and costs, which will probably total more than $250 million, the average plaintiff will receive about $50,000 in the settlement. The settlement covers both state and federal cases.

* * *

> Sidney Taurel, Lilly's chief executive, said in a statement that the company had decided to settle the cases in part because the suits *"interfered with the process of physicians making treatment decisions."*

> Some doctors have been reluctant to prescribe Zyprexa because they feared they would be sued, Mr. Seeger said. As part of the settlement, the plaintiffs agreed to dismiss claims against doctors and other health care workers named as co-defendants. In addition, Lilly will require that the lawyers not disclose the documents they received from the company during the pretrial discovery process, Mr. Seeger said.

> "It is very important and material to Lilly that these documents not be made public," he said.

75.    Defendant Taurel continued to assert that the claims were "without merit."

76.    The *Indianapolis Star* reported the following concerning the product liability lawsuit settlements and defendants' continuing claim that Zyprexa is not linked to diabetes:

> Lilly has maintained that its drug is not to blame for diabetes-related problems. Lechleiter said schizophrenia patients are prone to weight gain and also suffer a fourfold greater incidence of diabetes than the general population.

77.    The *Indianapolis Star* published an article on September 2, 2005, regarding the Company's dispute with insurers relating to the payout of $500 million to settle product-liability claims. The story contained the following:

> Eli Lilly and Co. wants its insurers to cover half of the $1 billion the drug maker has set aside to pay for product-liability claims involving its antipsychotic Zyprexa.

The amount the company seeks from insurers is partially detailed in court records and was confirmed this week by Lilly, which is suing five of its insurers to force them to pay up.

While a $500 million payout by insurers would go a long way toward covering the huge Zyprexa-related writeoff taken in the second quarter, it's by no means certain Lilly will collect the money.

Four of the insurers are fighting Lilly's lawsuit, filed in March in federal court in Indianapolis. *They argue that Lilly bought liability coverage for Zyprexa in 2000 without disclosing that it knew at the time that Zyprexa could cause harmful, diabetes-related side effects in some users.*

*Hiding that information was "egregious" behavior by Lilly and voids the coverage, the insurers say in court motions.*

The insurers argue in several nearly identically worded filings that if they had known about Zyprexa's serious side effects, the insurers "would not have agreed to insure Lilly at all, would have excluded coverage for Zyprexa ... or would have provided insurance coverage to Lilly on terms and conditions substantially different."

*"Lilly knew Zyprexa represented a serious liability exposure to it and any insurer that provided coverage to Lilly,"* said SR International Business Insurance Co., one of the companies Lilly is suing.

78.     Lilly subsequently conducted a conference call on April 20, 2006 with financial analysts in which defendants yet again contended that Zyprexa did not cause diabetes. The call included the following statements:

Charley Golden – *Eli Lilly & Co – CFO*

Steve, it's Charley. Let me see if I can take the first question you had on Zyprexa. We've reached agreement with the plaintiffs' lawyers to settle a majority of the claims. We talked about, when we announced the reserve that we took, that that was about 8000 or so. So we have reached agreement. In addition, there's been an additional settlement reached for 2000 to 2500 or so. So that brings our total cases handled, if you will, to put it that way, to over 10,000. So we're definitely meeting our goal in that respect. There were sort of a flurry of cases filed around or prior to March 1st. This relates, I think, to the perception by plaintiffs' counsels that these cases might become time barred at that point in time because the dear doctor letter which we had sent out about that time two years ago. We actually believe that the statute of limitations actually expired earlier, which is the case we would make in our vigorous defense of any of these cases coming through.

This flurry of cases that came, I think, they obviously require a lot of examination, but *some of the things that we've seen sort of at first blush are people who never took Zyprexa, people who had diabetes before they ever started taking Zyprexa,* in addition people who were already in one of the previous settlements. So this, I think in our view, is kind of the tail end of this situation and so suffice it to say that I think we made it very clear at the time that we took the reserve that we would continue to vigorously defend the Zyprexa situation. And we really believe that the remaining reserve is adequate to resolve any of our current exposures.

## THE TRUTH ABOUT ZYPREXA EMERGES

79.     The *New York Times* reported on December 17, 2006 that internal data at the Company demonstrated that defendants knew all along about the risks of Zyprexa, but nevertheless orchestrated a cover-up to improperly deceive the public and to protect Zyprexa sales. The article stated in pertinent part as follows:

> Lilly's own published data, which *it told its sales representatives to play down in conversations with doctors*, has shown that 30 percent of patients taking Zyprexa gain 22 pounds or more after a year on the drug, and some patients have reported gaining 100 pounds or more. *But Lilly was concerned that Zyprexa's sales would be hurt if the company was more forthright about the fact that the drug might cause unmanageable weight gain or diabetes*, according to the documents, which cover the period 1995 to 2004.

* * *

> Critics, including the *American Diabetes Association, have argued that Zyprexa, introduced in 1996, is more likely to cause diabetes than other widely used schizophrenia drugs*. Lilly has consistently denied such a link, and *did so again on Friday in a written response to questions about the documents*. The company defended Zyprexa's safety, and said the documents had been taken out of context.

> *But as early as 1999, the documents show that Lilly worried that side effects from Zyprexa*, whose chemical name is olanzapine, would hurt sales.

> *"Olanzapine-associated weight gain and possible hyperglycemia is a major threat to the long-term success of this critically important molecule,"* Dr. Alan Breier wrote in a November 1999 e-mail message to two-dozen Lilly employees that announced the formation of an "executive steering committee for olanzapine-associated weight changes and hyperglycemia." Hyperglycemia is high blood sugar.

> At the time Dr. Breier, who is now Lilly's chief medical officer, was the chief scientist on the Zyprexa program.

> *In 2000, a group of diabetes doctors that Lilly had retained to consider potential links between Zyprexa and diabetes warned the company that "unless we come clean on this, it could get much more serious than we might anticipate,"* according to an e-mail message from one Lilly manager to another.

> And in that year and 2001, the documents show, Lilly's own marketing research found that psychiatrists were consistently saying that many more of their patients developed high blood sugar or diabetes while taking Zyprexa than other antipsychotic drugs.

* * *

> *[In its written response, Lilly said,] "In summary, there is no scientific evidence establishing that Zyprexa causes diabetes...."*

* * *

> *The documents – which include e-mail, marketing material, sales projections and scientific reports – are replete with references to Zyprexa's*

- 34 -

*importance to Lilly's future and the need to keep concerns about diabetes and obesity from hurting sales.* But that effort became increasingly difficult as doctors saw Zyprexa's side effects, the documents show.

In 2002, for example, Lilly rejected plans to give psychiatrists guidance about how to treat diabetes, worrying that doing so would tarnish Zyprexa's reputation. "Although M.D.'s like objective, educational materials, having our reps provide some with diabetes would further build its association to Zyprexa," a Lilly manager wrote in a March 2002 e-mail message.

* * *

The documents show that *Lilly encouraged its sales representatives to play down those effects when talking to doctors. In one 1998 presentation, for example, Lilly said its salespeople should be told, "Don't introduce the issue!!!"* Meanwhile, the company researched combinations of Zyprexa with several other drugs, hoping to alleviate the weight gain. But the combinations failed.

To reassure doctors, Lilly also publicly said that when it followed up with patients who had taken Zyprexa in a clinical trial for three years, it found that weight gain appeared to plateau after about nine months. But the company did not discuss a far less reassuring finding in early 1999, disclosed in the documents, that blood sugar levels in the patients increased steadily for three years.

In 2000 and 2001, more warning signs emerged, the documents show. In four surveys conducted by Lilly's marketing department, *the company found that 70 percent of psychiatrists polled had seen at least one of their patients develop high blood sugar or diabetes while taking Zyprexa, compared with about 20 percent for Risperdal or Seroquel. Lilly never disclosed those findings.*

By mid-2003, Lilly began to change its stance somewhat, publicly acknowledging that Zyprexa can cause severe obesity. Marketing documents make clear that by then Lilly believed it had no choice. On June 23, 2003, an internal committee reported that Zyprexa sales were "below plan" and that doctors were "switching/avoiding Zyprexa."

Since then, Lilly has acknowledged Zyprexa's effect on weight but has argued that it does not necessarily correlate to diabetes. But Zyprexa's share of antipsychotic drug prescriptions is falling, and some psychiatrists say they no longer believe the information Lilly offers.

80.    The *New York Times* published a follow-up report on December 18, 2006 detailing the defendants' attempts to convince doctors to prescribe Zyprexa despite the known risks. The article stated in pertinent part as follows:

Zyprexa is not approved to treat dementia or dementia-related psychosis, and in fact carries a prominent warning from the F.D.A. that it increases the risk of death in older patients with dementia-related psychosis. Federal laws bar drug makers from promoting prescription drugs for conditions for which they have not been approved – a practice known as off-label prescription – although doctors can prescribe drugs to any patient they wish.

Yet in 1999 and 2000 *Lilly considered ways to convince primary care doctors that they should use Zyprexa on their patients*. In one document, an unnamed Lilly marketing executive wrote that these doctors "do treat dementia" but "do not treat bipolar; schizophrenia is handled by psychiatrists."

As a result, "dementia should be first message," of a campaign to primary doctors, according to the document, which appears to be part of a larger marketing presentation but is not marked more specifically.

Later, the same document says that some primary care doctors "might prescribe outside of label."

81.    Thereafter, on December 21, 2006, the *New York Times* published an article addressing defendants' intentional non-disclosure of pertinent clinical trials that demonstrated that Zyprexa did in fact cause weight gain and eventually led to diabetes. The report stated in part:

For at least a year, ***Eli Lilly provided information to doctors about the blood-sugar risks of its drug Zyprexa that did not match data that the company circulated internally*** when it first reviewed its clinical trial results, according to company documents.

The original results showed that patients on Zyprexa, Lilly's pill for schizophrenia, were 3.5 times as likely to experience high blood sugar levels as those taking a placebo, according to a February 2000 memo sent to top Lilly scientists. The memo is one of hundreds of internal Lilly documents provided to the New York Times by a lawyer in Alaska who represents mentally ill patients.

But the results that Lilly eventually provided to doctors until at least late 2001 were very different. Those results indicated that patients taking Zyprexa were only slightly more likely to suffer high blood sugar as those taking a placebo, or an inactive pill.

***Another Lilly report, from November 1999, shows that Lilly found after examining 70 clinical trials that 16 percent of patients taking Zyprexa for a year gained more than 66 pounds.***

***The company did not publicly disclose that figure,*** instead focusing on data from a smaller group of clinical trials that showed about 30 percent of patients gained 22 pounds.

Weight gain and high blood sugar are important risk factors for diabetes, and the question of whether Zyprexa causes diabetes has been a subject of scientific debate for several years.

Lilly says no link has ever been proven.

In response to questions about the difference between its first view of the data and its subsequent public description, Lilly issued a statement yesterday saying that the later figures were accurate and the information in February 2000 was out of context.

In yesterday's statement, the company said that after the February 2000 memo, it re-examined its clinical trial results and found errors in its "final, standard quality check of the data."

But the February 2000 document, which is labeled "Confidential," does not indicate that the figures it contains are preliminary. In fact, in a footnote, it explains that the data exclude patients "from whom there was a probable lab error."

A separate document from November 1999 includes handwritten figures identical to those from the February document, with additional detail about the increases in blood sugar that patients suffered.

The revised figures were shared with the Food and Drug Administration, Lilly said. It did not say whether it had ever disclosed the initial data to the F.D.A.

The F.D.A. did not respond to requests for comment yesterday.

The 2000 memo indicates that it was prepared as Lilly considered changing Zyprexa's prescription label to provide doctors with more information about the drug's potential to raise blood-sugar levels.

The issue was crucially important to the sales prospects of Zyprexa, which was introduced in 1996. Psychiatrists were already increasingly aware by 2000 that Zyprexa caused severe weight gain in many patients.

"In 1999, we already were thinking this drug causes weight gain – that's clear – and there could be a lot of other metabolic consequences of that," Dr. David N. Osser, a psychiatry professor at Harvard University, said yesterday. "The weight gain itself is a known risk factor for diabetes."

The February 2000 memo was prepared as background for a meeting of Lilly scientists to the possible changes for Zyprexa's label.

According to the memo, *Lilly scientists initially wanted to propose a relatively straightforward statement on the label that high blood sugar had been observed in patients taking Zyprexa in clinical trials. That change was never made.*

Lilly's analysis in early 2000 came at a time when some doctors and regulatory agencies were beginning to question whether Zyprexa could cause increases in blood sugar or diabetes. Although Lilly says that no link between Zyprexa and diabetes has ever been proven, the American Diabetes Association found in 2004 that Zyprexa was more likely to cause diabetes than other, similar drugs.

Zyprexa is by far Lilly's best-selling product, with $4.2 billion in sales in 2005, which represented 30 percent of Lilly's overall revenue. Zyprexa's active ingredient is a potent chemical that binds to receptors in the brain to reduce the hallucinations and delusions associated with schizophrenia and acute bipolar disorder. About two million people worldwide took Zyprexa last year.

At the February 2000 meeting for which the memo was prepared, the agenda was to discuss Zyprexa's tendency to cause high blood sugar, which is medically known as hyperglycemia.

According to the memo, Lilly had reviewed data from its clinical trials and found that "the incidence of treatment-emergent hyperglycemia in olanzapine group (3.6%) was higher than that in the placebo group (1.05%)." Olanzapine is the generic for Zyprexa.

*But when Lilly subsequently discussed the clinical trials results with doctors, it used a different comparison.* Lilly told doctors that Zyprexa had caused 3.1 percent of patients – not 3.6 percent – to have high-blood sugar. And it said that 2.5 percent of patients on the placebo – not 1.05 percent – had high-blood sugar. As a result, the rates of high blood sugar in the two groups seemed almost identical in the revised data.

- 37 -

**Lilly Pays $500 Million to Settle the Remaining Product Liability Claims**

82.    Lilly issued a press release on January 4, 2007, stating:

Eli Lilly and Company announced today that it has entered into settlement agreements with 14 plaintiffs' firms (or groups of plaintiffs' firms) involved in Zyprexa liability litigation to resolve the vast majority of remaining product liability claims against Lilly relating to the medication. These settlement agreements follow a master settlement agreement Lilly entered into in June 2005 that covered approximately 8,000 claimants in the United States, as well as additional settlements of approximately 2,500 claims.

* * *

As a result of these new settlements, Lilly will record a fourth-quarter 2006 charge for product liability litigation. The amount of the charges is currently under review, but it is not expected to exceed *$500 million.*

## DEFENDANTS' IMPROPER MARKETING OF ZYPREXA

83.    The state of Mississippi filed a lawsuit in Lafeyette County Circuit Court on July 24, 2006. In that suit the Mississippi Attorney General alleged that Lilly engaged in a calculated marketing plan to defraud the state Medicaid program out of millions of dollars for unproven and potentially unsafe uses of Zyprexa.  The suit charged that Lilly had promoted Zyprexa for unapproved uses, *including for children.*

84.    The caption of the case was *Hood v. Eli Lilly and Co.*, No. L06-280, Circuit Court, Lafeyette County, Mississippi.  The complaint alleged that the rapid growth of Zyprexa sales in Mississippi "is primarily due to increased prescriptions by primary care physicians for non-medically accepted indications that are excluded from payment under the provisions of the Mississippi Medicaid Prescription Drug Program." The suit alleged that following FDA approval of Zyprexa for treatment of patients with diagnoses of schizophrenia or a bipolar disorder, the Company, under defendants' direction, orchestrated a scheme to increase sales of Zyprexa while avoiding the expense and delay of obtaining approval of other new, expanded or additional uses of the drug.  The suit alleged that the scheme consisted of the promotion of Zyprexa for non-medically accepted conditions which were excluded from payment under the Mississippi Medicaid Prescription Drug Program.

85.    The lawsuit also alleged that the Company provided specific training and instruction to its primary care sales force to attempt to expand Zyprexa's market by convincing primary care physicians to prescribe the drug for mood, thought and behavioral disturbances. The suit also alleged that the Company established a consistent sales message "based on patients' symptoms and behaviors,

rather than on their confirmed diagnoses." According to the suit, Lilly, through its primary care sales force, presented physicians with hypothetical patient profiles, which included "patients complaining of symptoms such as anxiousness, irritability, mood swings and disturbed sleep, and submitting to physicians that such hypothetical patients would be medically indicated for treatment with Zyprexa." The doctors would rely upon this information to prescribe Zyprexa for non-approved uses, the lawsuit claimed, as a direct response to Lilly's conduct in marketing the drug. "As a result," it stated, "Mississippi is spending millions of dollars on Zyprexa for patients who are not indicated for the drug; and further, who are being harmed by it." The complaint also alleged that Lilly did not properly warn of the dangers related to the drug, such as the increased risk of diabetes and that treatment for beneficiaries who became ill from Zyprexa increased the state's Medicaid costs. The suit alleged that the Company knew that Zyprexa increased the risk of diabetes, pointing out that in April 2002, nearly a year and a half before Lilly first warned of the risk of diabetes in the U.S., the Company changed the drug's labeling in the U.K. and Japan to include warnings about the association between Zyprexa and diabetes-related injuries. The investigation by the Mississippi Attorney General's office concluded that roughly 10% of patients who were prescribed Zyprexa have subsequently developed insulin-dependent diabetes.

86.     At present, no less than seven other states have followed Mississippi's lead, initiating similar litigation against the Company. Additional states appear to be preparing to do the same. One such lawsuit brought by the state of Alaska went to trial in March 2008, resulting in a settlement pursuant to which Lilly agreed to pay $15 million.

87.     The Company is also under investigation by the federal government in connection with its marketing of Zyprexa. That investigation has been ongoing since 2004. Lilly has been in settlement discussions with the federal government in connection with that investigation since January 2008. The Company is expected to agree to pay more than $1 billion in fines to be divided amongst federal and state governments to settle the federal investigation. This is in addition to over $1.2 billion that Lilly has already paid out to settle over 31,000 Zyprexa related lawsuits.

## WHY LILLY'S STATEMENTS WERE IMPROPER

88.     Lilly's improper statements during the Relevant Period failed to disclose and misrepresented the following material adverse facts, all of which were known by defendants, were

consciously disregarded, or which the defendants were reckless and grossly negligent in not knowing or should have known:

(a)    A November 1999 unpublished Lilly report demonstrating that in 70 clinical trials, 16% of patients taking Zyprexa for one year gained more than 66 pounds.

(b)    An internal November 1999 e-mail message from defendant Breier to two-dozen Lilly employees stating that "Olanzopine-associated weight gain and possible hyperglycemia is a major threat to the long-term success of this critically important molecule."

(c)    A 1999 disovery that blood sugar levels increased in patients taking Zyprexa for three years, notwithstanding the fact that weight gain appeared to plateau after nine months.

(d)    A warning in 2000 from diabetes doctors that Lilly had retained to consider potential links between Zyprexa and diabetes that "unless we come clean on this, it could get much more serious than we might anticipate."

(e)    A finding in 2001 undisclosed Lilly marketing research that psychiatrists were consistently saying that many more of their patients developed high blood sugar or diabetes while taking Zyprexa than other antipsychotic drugs.

(f)    A finding in four undisclosed surveys conducted by Lilly's marketing department that 70% of psychiatrists polled had seen at least one of their patients develop high blood sugar or diabetes while taking Zyprexa, compared with about 20% for Zyprexa's competitors Risperdal or Seroquel.

(g)    A finding in an undisclosed February 2000 memo sent to top Lilly scientists that patients on Zyprexa were 3.5 times as likely to experience high blood sugar levels as those taking a placebo.

(h)    A finding in Lilly's undisclosed review of data from its own clinical trials that the incidence of treatment-emergent hyperglycemia in the olanzapine group (3.6%) was higher than that in the placebo group (1.05%).

(i)    The defendants caused or allowed the Company to engage in an orchestrated marketing plan to defraud state Medicaid programs out of millions of dollars for unproven and potentially unsafe uses of Zyprexa.

## DAMAGES TO THE COMPANY

89.    Due to the Individual Defendants' improprieties, Lilly disseminated false and misleading statements concerning the safety and efficacy of Zyprexa, and misrepresented its business prospects as alleged above. Furthermore, as a result of the defendants' Relevant Period improprieties, Lilly is now the subject of several class action lawsuits that allege violations of the federal securities laws.

90.    As a direct and proximate result of the Individual Defendants' actions as alleged above, Lilly's market capitalization has been damaged by over $15 billion. Contemporaneous with the harm that the Individual Defendants were inflicting on Lilly's market capitalization, the Insider Selling Defendants were profiting handsomely by selling over $25 million of their personally held stock.

91.    In addition, as a direct and proximate result of Individual Defendants' actions, Lilly has expended and will continue to expend substantial sums of money. These expenditures include, but are not limited to:

(a)    costs incurred in connection with internal investigations, including legal fees paid to outside counsel;

(b)    costs incurred ancillary to the repurchase of $1.1 billion worth of the Company's stock at artificially inflated prices;

(c)    costs incurred in connection with the investigation, defense and settlement of thousands of product liability lawsuits;

(d)    costs incurred in connection with the investigation and defense of the Company in Medicaid costs recovery lawsuits filed by individual states;

(e)    costs incurred in connection with the investigation and defense of the Company in the federal investigation of Lilly's Zyprexa marketing;

(f)    costs incurred in connection with the investigation and defense of the Company and certain officers in securities class actions, plus potentially millions of dollars in settlements or to satisfy an adverse judgment;

(g)    costs incurred from compensation and benefits paid to the defendants who have breached their fiduciary duties to Lilly; and

(h)    costs incurred from the loss of doctor and patient confidence in the safety and efficacy of Lilly's products.

92.    The conduct underlying this action has also irreparably damaged Lilly's corporate image and goodwill. For at least the foreseeable future, Lilly will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Lilly's ability to raise equity capital or debt on favorable terms in the future is now impaired.

### THE IMPROPER BUYBACK

93.    During the Relevant Period, while Lilly's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $1.1 billion worth of Lilly's shares at an average price of approximately $71.58 per share, which is substantially higher than Lilly's current share price of less than $49 per share. On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's improper marketing of Zyprexa, among other things.

### ILLEGAL INSIDER SELLING

94.    While in possession of the undisclosed material adverse information discussed above, the Insider Selling Defendants sold the following shares of Lilly stock:

| Defendant | Transaction Dates | Shares | Price | Proceeds |
|---|---|---|---|---|
| GOLDEN | 5/31/2005 | 13,400 | $58.45 | $783,230.00 |
| | 5/31/2005 | 300 | $58.49 | $17,547.00 |
| | 5/31/2005 | 4,500 | $58.50 | $263,250.00 |
| | 5/31/2005 | 500 | $58.51 | $29,255.00 |
| | 5/31/2005 | 200 | $58.52 | $11,704.00 |
| | 5/31/2005 | 200 | $58.54 | $11,708.00 |
| | 5/31/2005 | 200 | $58.55 | $11,710.00 |
| | 5/31/2005 | 1,480 | $58.56 | $86,668.80 |
| | 8/31/2005 | 4,500 | $54.00 | $243,000.00 |
| | 8/31/2005 | 771 | $54.05 | $41,672.55 |
| | 11/30/2005 | 10,000 | $50.40 | $504,000.00 |
| | 11/30/2005 | 12,200 | $50.45 | $615,490.00 |
| | 11/30/2005 | 17 | $50.47 | $857.99 |
| | 2/1/2006 | 2,784 | $56.62 | $157,630.08 |
| | 2/28/2006 | 500 | $56.16 | $28,080.00 |
| | 2/28/2006 | 500 | $56.17 | $28,085.00 |
| | 2/28/2006 | 500 | $56.18 | $28,090.00 |

| | | | | |
|---|---|---|---|---|
| | 2/28/2006 | 400 | $56.19 | $22,476.00 |
| | 2/28/2006 | 14,700 | $56.20 | $826,140.00 |
| | 2/28/2006 | 1,700 | $56.21 | $95,557.00 |
| | 2/28/2006 | 600 | $56.22 | $33,732.00 |
| | 2/28/2006 | 269 | $56.23 | $15,125.87 |
| | 2/28/2006 | 1,800 | $56.24 | $101,232.00 |
| | 2/28/2006 | 200 | $56.26 | $11,252.00 |
| | | **72,221** | | **$3,967,493.29** |
| | | | | |
| HORN | 6/15/2006 | 800 | $53.88 | $43,104.00 |
| | 6/15/2006 | 700 | $53.88 | $37,716.00 |
| | 6/15/2006 | 555 | $53.88 | $29,903.40 |
| | | **2,055** | | **$110,723.40** |
| | | | | |
| LECHLEITER | 2/1/2006 | 4,294 | $56.62 | $243,126.28 |
| | 7/31/2006 | 25,000 | $56.51 | $1,412,750.00 |
| | 9/15/2006 | 7,100 | $55.11 | $391,281.00 |
| | 9/15/2006 | 3,140 | $55.14 | $173,139.60 |
| | 10/23/2006 | 25,000 | $56.87 | $1,421,750.00 |
| | | **64,534** | | **$3,642,046.88** |
| | | | | |
| TAUREL | 8/23/2005 | 29 | $53.73 | $1,558.17 |
| | 8/23/2005 | 177,200 | $53.90 | $9,551,080.00 |
| | 8/23/2005 | 800 | $53.91 | $43,128.00 |
| | 8/23/2005 | 4,800 | $53.92 | $258,816.00 |
| | 8/23/2005 | 5,000 | $53.95 | $269,750.00 |
| | 8/23/2005 | 2,300 | $53.96 | $124,108.00 |
| | 8/23/2005 | 2,027 | $53.97 | $109,397.19 |
| | 8/23/2005 | 4,500 | $54.00 | $243,000.00 |
| | 2/1/2006 | 9,616 | $56.62 | $544,457.92 |
| | 6/30/2006 | 1,200 | $54.48 | $65,376.00 |
| | 6/30/2006 | 9,657 | $54.50 | $526,306.50 |
| | 6/30/2006 | 300 | $54.51 | $16,353.00 |
| | 6/30/2006 | 2,300 | $54.52 | $125,396.00 |
| | 6/30/2006 | 100 | $54.53 | $5,453.00 |
| | 6/30/2006 | 13,883 | $54.54 | $757,178.82 |
| | 8/3/2006 | 31,067 | $57.05 | $1,772,372.35 |
| | 8/3/2006 | 287 | $57.06 | $16,376.22 |
| | 8/3/2006 | 2,900 | $57.07 | $165,503.00 |
| | 8/3/2006 | 20,800 | $57.08 | $1,187,264.00 |
| | 8/3/2006 | 1,400 | $57.09 | $79,926.00 |
| | 8/3/2006 | 2,700 | $57.10 | $154,170.00 |
| | 9/29/2006 | 27,047 | $56.30 | $1,522,746.10 |
| | | **319,913** | | **$17,539,716.27** |
| | | | | |
| **TOTAL:** | | **458,723** | | **$25,259,979.84** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

95.    Plaintiff brings this action derivatively in the right and for the benefit of Lilly to redress injuries suffered, and to be suffered, by Lilly as a direct result of the breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act, as well as the aiding and abetting thereof, by the Individual Defendants.  Lilly is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.    Plaintiff will adequately and fairly represent the interests of Lilly in enforcing and prosecuting its rights.

97.    Plaintiff is and was an owner of the stock of Lilly during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

98.    The current Board of Lilly consists of the following twelve individuals: defendants Bischoff, Cook, Feldstein, Fyrwald, Gilman, Horn, Marram, Prendergast, Seifert, Lechleiter, Taurel and director Michael L. Eskew.  Plaintiff has not made any demand on the present Board of Lilly to institute this action because such a demand would be a futile, wasteful and useless act, particularly for the following reasons.

99.    30% of Lilly's revenues during the Relevant Period were derived from the sale of Zyprexa.  Thus, the stability of the Company was predicated on Lilly accurately and truthfully disclosing the known risks of Zyprexa and only marketing Zyprexa in a way that would meet the FDA's approval. Defendants Bischoff, Cook, Feldstein, Fyrwald, Gilman, Horn, Marram, Prendergast, Seifert, Lechleiter and Taurel knew or should have known these facts.  These defendants also knew or should have known that due to the critical importance of Zyprexa to the Company, any problems associated with the drug required the immediate attention of the Board.  Nevertheless, these defendants consciously disregarded their fiduciary duties to the Company by repeatedly asserting that Zyprexa did not cause diabetes-related side effects, intentionally suppressing and misrepresenting data showing that Zyprexa causes weight gain, high blood sugar, and diabetes, marketing Zyprexa and encouraging doctors to prescribe it for uses that were not approved by the FDA and approving wrongful public statements surrounding Zyprexa throughout the Relevant Period, as alleged herein.  Accordingly, defendants Bischoff, Cook, Feldstein,

Fyrwald, Gilman, Horn, Marram, Prendergast, Seifert, Lechleiter and Taurel each face a sufficiently substantial likelihood of liability for their breaches of fiduciary duty to Lilly.

100.     Defendants Bischoff, Cook, Feldstein, Fyrwald, Gilman, Horn, Marram, Prendergast, Seifert, Lechleiter and Taurel, as members of the Board during the Relevant Period, authorized the repurchase of over $1.1 billion worth of the Company's shares at artificially inflated prices. The Board's decision to authorize the stock repurchases was not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider that Lilly's value was artificially inflated due to the improper statements alleged above. Accordingly, demand is futile.

101.     As a result of their access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors; and attendance at management and Board meetings, each of the defendants knew the adverse non-public information regarding the side effects and known risks of Zyprexa. While in possession of this material adverse non-public information regarding the Company, the following current members of the Lilly Board participated in the illegal insider selling:

(a)     During the Relevant Period, while in possession of adverse non-public information regarding the side effects and known risks of Zyprexa, Taurel sold 319,913 shares of Lilly stock for proceeds of $17,539,716.27;

(b)     During the Relevant Period, while in possession of adverse non-public information regarding the side effects and known risks of Zyprexa, Lechleiter sold 64,534 shares of Lilly stock for proceeds of $3,642,046.88; and

(c)     During the Relevant Period, while in possession of adverse non-public information regarding the side effects and known risks of Zyprexa, Horn sold 2,055 shares of Lilly stock for proceeds of $110,723.40.

Because these defendants received a personal financial benefit from the challenged insider trading transactions, these defendants are interested and therefore incapable of considering a demand from plaintiff. Moreover, these defendants face a sufficiently substantial threat of liability for breach of their fiduciary duties for insider selling. Since these directors have breached their fiduciary duties and are interested, any demand upon them is futile.

102.     During the Relevant Period, defendants Cook, Feldstein, Prendergast and Seifert were members of the Audit Committee. The Audit Committee is responsible for general oversight of the Company's disclosure controls, accounting and financial reporting process of the Company, and audits of its financial statements, including: (i) ensuring the adequacy of the Company's systems of disclosure controls; (ii) inquiring of management, the general auditor and the independent auditors about significant financial risks or exposures; (iii) evaluating the steps management has taken to assess and minimize significant financial risks or exposures to the Company; and (iv) ensuring the Company's compliance with legal and ethical requirements. Thus, the Audit Committee was responsible for overseeing and directly participating in Lilly's disclosure controls and evaluating significant financial risks or exposures to the Company. Defendants Cook, Feldstein, Prendergast and Seifert breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of improper public statements that contained false and/or misleading material information about the side effects and risks of Zyprexa. The Audit Committee also failed to ensure that Lilly complied with FDA requirements concerning marketing Zyprexa. Furthermore, the Audit Committee failed to ensure that the Company had in place requisite internal controls over its public disclosures to prevent the Company from making improper public statements about the Company's pharmaceutical products. Finally, these defendants reviewed and failed to correct Lilly's improper press releases described more fully herein. As a result, Lilly faces substantial liability in connection with the concealment of problems associated with Zyprexa. Therefore, defendants Cook, Feldstein, Prendergast and Seifert face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

103.     During the Relevant Period, defendants Fyrwald, Gilman, Lechleiter and Prendergast were members of the Science and Technology Committee. The Science and Technology Committee of the Board advises the Board on scientific matters involving the Company's discovery and development programs, including major internal projects, interaction with academic and other outside research organizations and the acquisition of technologies. The Science and Technology Committee's responsibilities include assisting the Board and management to stay abreast of new developments and new technologies and anticipate emerging concepts and trends in pharmaceutical research and

development to assure the Company makes well-informed choices in committing its scientific resources. Specifically, the Science and Technology Committee was responsible for assisting the Board with its oversight responsibility for risk management in areas affecting the Company's research and development. Defendants Fyrwald, Gilman, Lechleiter and Prendergast breached their fiduciary duties of due care, loyalty and good faith because the Science and Technology Committee failed to ensure that the Company's public disclosures regarding Zyprexa were accurate with respect to information concerning its research and development. As a result, the Company faces substantial liability in connection with the cover-up of problems associated with Zyprexa. Therefore, defendants Fyrwald, Gilman, Lechleiter and Prendergast face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

104. During the Relevant Period, defendants Feldstein, Gilman, Prendergast and Seifert were members of the Public Policy and Compliance Committee. The Public Policy and Compliance Committee of the Board reviews, identifies and brings to the attention of the Board political, social and legal trends and issues, and compliance matters that may have an impact on the business operations, financial performance or public image of the company. Specifically, the Public Policy and Compliance Committee is charged with making recommendations to the Board on matters including clinical research, research and development, sales and marketing, and product quality. The Public Policy and Compliance Committee also is to assist the Board with its oversight of legal and regulatory compliance, including the Company's state of compliance and significant legal or regulatory compliance exposure. Defendants Feldstein, Gilman, Prendergast and Seifert breached their fiduciary duties of due care, loyalty and good faith because the Public Policy and Compliance failed to ensure that Lilly complied with FDA requirements concerning marketing Zyprexa. The Public Policy and Compliance Committee also failed to ensure that Lilly complied with FDA requirements concerning marketing Zyprexa. Furthermore, the Public Policy and Compliance Committee failed to ensure that the Company had in place requisite internal controls over its public disclosures to prevent the Company from making improper public statements about the Company's pharmaceutical products' quality and safety. As a result, the Company faces substantial liability in connection with the cover-up of problems associated

with Zyprexa. Therefore, defendants Feldstein, Gilman, Prendergast and Seifert face a sufficiently substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

105.    During the Relevant Period, defendants Bischoff, Horn and Marram were members of the Directors and Corporate Governance Committee. The Directors and Corporate Governance Committee of the Board determines the compensation of the Company's directors. The Directors and Corporate Governance Committee's responsibilities include reviewing and making recommendations to the Board regarding the compensation of non-employee directors and evaluating the non-employee directors' performance. As the members of the Compensation Committee singularly control the other defendants' awards, the remaining members of the Board will not institute this action against defendants Bischoff, Horn and Marram. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Cook, Feldstein, Fyrwald, Gilman, Lechleiter, Prendergast, Seifert and Taurel is futile.

106.    During the Relevant Period, defendants Fyrwald, Horn and Marram were members of the Compensation Committee. The Compensation Committee of the Board determines the compensation of the Company's executives. The Compensation Committee's responsibilities include reviewing and approving corporate goals and objectives relevant to CEO compensation, evaluating the CEO's performance, determining and approving the CEO's compensation level, preparing the annual report on compensation, and administering the Company's equity and other compensation plans. As the members of the Compensation Committee singularly control the compensation of defendants Lechleiter and Taurel, these defendants will not institute this action against defendants Fyrwald, Horn and Marram. To do so would jeopardize each defendant's personal financial compensation. Thus, demand on defendants Lechleiter and Taurel is futile.

107.    The principal professional occupation of defendant Taurel is his employment with Lilly, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, in 2006, Lilly paid defendant Taurel $1,650,333 in salary, $2,764,308 in bonus, $5,400,000 in restricted stock awards, $1,417,434 via a change in pension value, $192,409 in other compensation and 216,867 options. Accordingly, defendant Taurel lacks independence from defendants Fyrwald, Horn and Marram, interested defendants who exert influence over defendant Taurel's

compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant Taurel incapable of impartially considering a demand to commence and vigorously prosecute this action.

108.    The principal professional occupation of defendant Lechleiter is his employment with Lilly, pursuant to which he received and continues to receive substantial monetary compensations and other benefits. Specifically, in 2006, Lilly paid defendant Lechleiter $1,112,000 in salary, $1,490,080 in bonus, $3,510,000 in restricted stock awards, $1,156,247 via a change in pension value, $68,790 in other compensation and 140,964 options. Accordingly, defendant Lechleiter lacks independence from defendants Fyrwald, Horn and Marram, interested defendants who exert influence over defendant Lechleiter's compensation by virtue of their position as members of the Compensation Committee. This lack of independence renders defendant Lechleiter incapable of impartially considering a demand to commence and vigorously prosecute this action.

109.    Defendant Lechleiter joined Lilly as a senior organic chemist in 1979. He was named Vice President for Development and Regulatory Affairs in 1998, and Executive Vice President for Pharmaceutical Products and Corporate Development in 2001. By his specialized expertise in the discovery, development and manufacturing of pharmaceutical products defendant Lechleiter was in a unique position to understand the business of Lilly, as well as understand clinical studies indicating that Zyprexa caused weight gain, high blood sugar and diabetes at a higher rate than Zyprexa's competitors. Because of this knowledge, defendant Lechleiter had a heightened duty to ensure Lilly's public statements concerning the safety of the Company's pharmaceutical products were accurate and truthful. Furthermore, defendant Lechleiter had a duty to ensure that Lilly was in compliance with all applicable FDA and Medicaid requirements. This defendant, because of his unique qualifications, had a heightened duty to ensure the accuracy and fairness of Lilly's public statements. Nonetheless, defendant Lechleiter breached his duties by causing or allowing the improper public statements described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

110.    Defendant Gilman is a medical doctor and is the Dean of the Southwestern Medical School, the Raymond and Ellen Willie Professor of Molecular Neuropharmacology, and a professor of the Department of Pharmacology at the University of Texas Southwestern Medical Center at Dallas.

Defendant Gilman is also a member of the National Academy of Sciences, and received the Nobel Prize for Physiology of Medicine in 1994. By his specialized expertise in the medical and pharmaceutical field, defendant Gilman was in a unique position to understand the business of Lilly, as well as understand clinical studies indicating that Zyprexa caused weight gain, high blood sugar and diabetes at a higher rate than Zyprexa's competitors. Because of this knowledge, defendant Gilman had a heightened duty to ensure Lilly's public statements concerning the safety of the Company's pharmaceutical products were accurate and truthful. Nonetheless, defendant Gilman breached his duties by causing or allowing the improper public statements described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

111.    Defendant Prendergast is a medical doctor and is the Edmond and Marion Guggenheim Professor of Biochemistry and Molecular Biology and a Professor of Molecular Pharmacology and Experimental Therapeutics at Mayo Medical School. By his specialized expertise in the medical field, defendant Prendergast was in a unique position to understand the business of Lilly, as well as understand clinical studies indicating that Zyprexa caused weight gain, high blood sugar and diabetes at a higher rate than Zyprexa's competitors. Because of this knowledge, defendant Prendergast had a heightened duty to ensure Lilly's public statements concerning the safety of the Company's pharmaceutical products were accurate and truthful. Nonetheless, defendant Prendergast breached his duties by causing or allowing the improper public statements described herein. As a result of this defendant's breach of his duties, any demand upon him is futile.

112.    The entire Lilly Board and senior management participated in the wrongs complained of herein. Lilly's directors are not disinterested or independent due to the following: defendants Bischoff, Cook, Feldstein, Fyrwald, Gilman, Horn, Marram, Prendergast, Seifert, Lechleiter and Taurel served on the Lilly Board during the Relevant Period. Pursuant to their specific duties as Board members, each was charged with the management of the Company and to conduct its business affairs. Each of the above referenced defendants breached the fiduciary duties that they owed to Lilly and its shareholders in that they caused or failed to prevent and correct the improper public statements concerning Zyprexa, caused or allowed the Company to market Zyprexa to states for off-label uses. It follows that the Lilly Board cannot exercise independent objective judgment in deciding whether to bring this action or

whether to vigorously prosecute this action because its members are interested personally in the outcome as it is their actions that have subjected Lilly to potentially millions of dollars in liability for violations of applicable securities laws.

113.    Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

114.    The Director Defendants of Lilly, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Lilly's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein, and are therefore not disinterested parties.

115.    In order to bring this suit, all of the directors of Lilly would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

116.    The acts complained of constitute violations of the fiduciary duties owed by Lilly's officers and directors and these acts are incapable of ratification.

117.    Each of the Director Defendants of Lilly authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the false and misleading statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

118.    Any suit by the current directors of Lilly to remedy these wrongs would likely expose the Individual Defendants and Lilly to further violations of the securities laws that would result in civil actions being filed against one or more of the Individual Defendants, thus, they are hopelessly conflicted in making any supposedly independent determination whether to sue themselves.

119.    Lilly has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lilly any part of the damages Lilly suffered and will suffer thereby.

120.    If the current directors were to bring this derivative action against themselves, they would thereby expose their own misconduct, which underlies allegations against certain of them contained in class action complaints for violations of securities law, which admissions would impair the defense of the class actions and greatly increase the probability of their personal liability in the class actions, in an amount likely to be in excess of any insurance coverage available to the Individual Defendants. In essence, they would be forced to take positions contrary to the defenses they will likely assert in the securities class actions. This they will not do. Thus, demand is futile.

121.    If Lilly's current and past officers and directors are protected against personal liability for their acts of mismanagement, abuse of control and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Lilly. However, due to certain changes in the language of directors' and officers' liability insurance policies in the past few years, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Lilly against these defendants, known as, *inter alia*, the "insured versus insured exclusion." As a result, if these directors were to sue themselves or certain of the officers of Lilly, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. If there is no directors' and officers' liability insurance at all then the current directors will not cause Lilly to sue them, since they will face a large uninsured liability.

122.    Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for Lilly for any of the wrongdoing alleged by plaintiff herein.

123.    Plaintiff has not made any demand on shareholders of Lilly to institute this action since such demand would be a futile and useless act for at least the following reasons:

        (a)    Lilly is a publicly held company with over 1.1 billion shares outstanding, and thousands of shareholders;

- 52 -

(b)      making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)      making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

## COUNT I

### Against the Director Defendants and Defendant Golden for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

124.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

125.    During the Relevant Period, the Director Defendants and defendant Golden disseminated or approved public statements that improperly portrayed Lilly's business prospects, growth and margins.  The Director Defendants and defendant Golden knew that the Company's public statements concerning Zyprexa were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

126.    At the same time the price of the Company's common stock was inflated due to the improper reporting alleged above, the Director Defendants and defendant Golden were causing Lilly to repurchase over $1.1 billion worth of its own stock on the open market at an average inflated price of approximately $71.58 per share, which is substantially higher than Lilly's current share price of under $49 per share.

127.    As such, the Director Defendants and defendant Golden violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)      employed devices, schemes and artifices to defraud;

(b)      made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)      engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lilly and others in connection with their purchases of Lilly common stock during the Relevant Period.

128.    As a result of the Director Defendants' and defendant Golden's misconduct, Lilly has

and will suffer damages in that it paid artificially inflated prices for Lilly common stock purchased on the open market. Lilly would not have purchased Lilly common stock at the prices it paid, had the market previously been aware that the market price of Lilly's stock was artificially and falsely inflated by defendants' misleading statements. As a direct and proximate result of these defendants' wrongful conduct, Lilly suffered damages in connection with its purchases of Lilly common stock during the Relevant Period. By reason of such conduct, the Director Defendants and defendant Golden are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against Defendants Lechleiter, Taurel, Golden, Cook, Feldstein, Prendergast and Seifert for Violation of §20(a) of the Exchange Act

129.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

130.    Defendant Lechleiter, Lilly's CEO and President, defendant Taurel, Lilly's former CEO, defendant Golden, Lilly's former CFO, and defendants Cook, Feldstein, Prendergast and Seifert, as members of the Audit Committee, directly or indirectly controlled or induced the Individual Defendants who violated §10(b) of the Exchange Act and SEC Rule 10b-5 as alleged above.

131.    These defendants are jointly and severally liable to the same extent as the Individual Defendants under §20(a) of the Exchange Act. These defendants did not act in good faith.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information

132.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

133.    At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold Lilly common stock on the basis of such information.

134.    The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold Lilly common stock.

135. At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated. The Insider Selling Defendants' sales of Lilly common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

136. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty

137. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138. The Individual Defendants owed and owe Lilly fiduciary obligations. By reason of their fiduciary relationships, the Officer Defendants and Director Defendants owed and owe Lilly the highest obligation of good faith, fair dealing, loyalty and due care.

139. The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

140. Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial results of the Company and failed to correct the Company's publicly reported financial results and guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

141. As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Lilly has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

142. Plaintiff, on behalf of Lilly, has no adequate remedy at law.

## COUNT V

### Against All Defendants for Breach of Fiduciary Duty for Abuse of Control

143.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

144.    The Individual Defendants' misconduct alleged herein constituted a breach of their fiduciary duties because they abused their ability to control and influence Lilly, for which they are legally responsible.

145.    As a direct and proximate result of the Individual Defendants' abuse of control, Lilly has sustained significant damages.

146.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

147.    Plaintiff, on behalf of Lilly, has no adequate remedy at law.

## COUNT VI

### Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement

148.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

149.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Lilly in a manner consistent with the operations of a publicly held corporation.

150.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Lilly has sustained significant damages in excess of hundreds of millions of dollars.

151.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

152.    Plaintiff, on behalf of Lilly, has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Waste of Corporate Assets

153.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.    As a result of the improper accounting, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper supervision, defendants have caused Lilly to waste valuable corporate assets by paying incentive based bonuses to certain of its executive officers and incur potentially billions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

155.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

156.    Plaintiff, on behalf of Lilly, has no adequate remedy at law.

## COUNT VIII

### Against All Defendants for Unjust Enrichment

157.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

158.    By their wrongful acts and omissions, defendants were unjustly enriched at the expense of and to the detriment of Lilly.

159.    Plaintiff, as a shareholder and representative of Lilly, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.     Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Exchange Act;

- 57 -

B.      Declaring that the Director Defendants and defendants Harford and Golden are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and that defendants Lechleiter, Taurel, Goldman, Cook, Feldstein, Prendergast and Seifert are jointly and severally liable under §20(a) of the Exchange Act and awarding Lilly damages;

C.      Directing Lilly to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lilly and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.      control and limit insider stock selling;

3.      a provision to permit the shareholders of Lilly to nominate at least three candidates for election to the Board;

4.      a proposal to ensure the accuracy of the qualifications of Lilly's directors, executives and other employees;

5.      a proposal to strengthen the Company's procedures for the receipt, retention and treatment of complaints received by the Company regarding internal controls and compliance matters;

6.      a proposal to strengthen the veracity of the Company's public statements concerning the safety and efficacy of its drug products; and

7.      appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Lilly has an effective remedy;

E.      Awarding to Lilly restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.     Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

G.     Granting such other and further relief as the Court deems just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Respectfully submitted,

MOSS LAW OFFICES

Marc J.M. Moss, Atty No. 22483-49
47 South Meridian Street, Suite 400
Indianapolis, IN 46204
317-464-2300 (tel.)
317-464-2301 (fax)
mmoss@mosslawllc.com

THE WARNER LAW FIRM

PAUL T. WARNER
6363 Woodway Drive, Suite 910
Houston, TX 77057
Telephone: (713) 783-7077
Facsimile: (713) 583-9196
pwarner@warner-law.net
*pro hac vice admission pending*

***Attorneys for Plaintiff***